# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# STATESBORO DIVISION

| | | |
|---|---|---|
| SONDRA LEE LANE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. CV614-123 |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This Social Security appeal presents a relatively standard claim --
that the ALJ erred in denying benefits -- but also a relatively rare,
procedural due process claim.

## I. BACKGROUND

Sondra Lee Lane applied for Disability Insurance Benefits (DIB) and
Medicare Part A benefits. Doc. 19-5 at 2.[1] The Social Security
Administration (SSA) denied her application following a hearing before an

---

[1] Doc." citations use the docket and page numbers imprinted by the Court's docketing
software. Those do not always line up with each paper document's printed
pagination. "Tr." citations, on the other hand, use the page numbers in the bottom
right corner of the administrative record, which is located on the docket at Doc. 19.

Administrative Law Judge (ALJ), doc. 19-2 at 38-48, and an appeal (with her presentation of new evidence) to the SSA's Appeals Council. Doc. 19-2 at 25; *see also* doc. 23 at 9-11.

The SSA reviewed hearing evidence (and a follow-up letter from Lane's doctor) showing that she was aged 61 at the time of the ALJ hearing. There she testified that she is in pain 24/7, her appetite is "iffy," and she is on an antidepressant. Doc. 19-2 at 57-58. Armed with a medical assistant's degree, she endures no difficulty reading, writing, or doing simple math unless she takes her medications (Flexeril and morphine, about 3-4 times a week), "then I probably couldn't spell dog for a couple of hours." *Id.* at 59.

Plaintiff further testified that, other than when her then-husband was stationed overseas in 1978, she had been continuously employed since her high school days in jobs such as a convenience store clerk, then a manager, doc. 19-2 at 67-68, and later a medical office administrative assistant until ultimately (in 2004) she worked as an administrative secretary and bookkeeper for a Bulloch, County, Georgia public school. "I was primarily at a desk probably half of the time, and then running

around the other half." Doc. 19-2 at 60. She was responsible for "ordering any supplies and everything that we would need, I did all that." *Id.* She occasionally would have to lift "a boxful of files that weighed maybe 10 or 20 pounds." *Id.* at 61.

The ALJ specifically questioned Lane about her jobs' physical demands. They required relatively little. From 1998-2004, for example, she worked as a "front office coordinator" and supply master for a medical practice group. *Id.* at 61-62. She "did all the weekly, monthly and year ending financial reports," but lifted nothing over 20 pounds. *Id.* at 62.

Lane's employment career effectively ended in September 2009. She had endured a "bowel resection" and "my back was getting so bad[2] that I couldn't hardly stand the pain and I missed a lot of days of work

---

[2]    The ALJ's decision explored the medical basis for her back pain. Lane had, for example,

> complained to providers of continued back pain. Specifically, July 2005 diagnostic imaging notes an "S-shaped" thoracolumbar scoliosis which has not significantly changed compared to the year 2003 examination. (Exhibit 9F). Further, records from East Georgia Regional Medical Center indicate that in 2006 the claimant received trigger point injections for back pain. (Exhibit11F). More recently, a May 2009 MRI of the lumbar spine revealed mild central spinal stenosis at L4-5, and more recent imaging indicates a diagnosis of scoliosis. (Exhibit 12F).

Doc. 19-2 at 45.

that year, and I never hardly used my sick days, and I left -- I mean I had days that I took off and I didn't get paid for it because I was out of sick days, and I just thought that, you know, once I had six weeks off for the summer and I thought, well, maybe I can get this under control."   Doc. 19-2 at 69 (footnote added).   Pain meds mentally dampened her ("If I did take my medicine, I was so sleepy and druggy, and you just mess around with money with a frame of mind like that especially, you know, with state and federal funds."), but if she did not take them then "I was in so much pain I couldn't concentrate on what I was doing."   *Id.*

Lane also claimed that she is allergic to anti-inflammatory medication, so she cannot address her back pain and muscle spasms. Doc. 19-2 at 71.   Nor does alternative medicine ("acupuncture, stuff like that") work.   *Id.*   On morphine since 2009, her pain pervades her back and hip regions.   "Dr. Purvis thinks that, you know, sometimes I'm getting flare up of fibromyalgia and again anti-inflammatories are recommended for that and I can't take that.   I can't take a lot of different pain medications, anything with codeine or anything like that, I'm allergic.   I'm a really hard patient.   He says I'm difficult to treat because

of my allergies." *Id.* Physical therapy is ineffective beyond the short term. *Id.* at 71-72. Nor are trigger-point injections or chiropractic measures. *Id.* at 72. Her pain meds only last for "about two hours and then the pain starts coming back, the stiffness returns." *Id.* at 73.

Lane exhibited pain-based discomfort at the ALJ hearing. Doc. 19-2 at 73-74 (in "the mid back, the mid back are from like my bra strap up, up into my neck and then if I sit too long in one position, I get pains going down this right hip and down my leg."); *see also id.* ("It's a throbbing, like somebody's twisting and pulling and -- it's like a toothache in the middle of your back."). Flexeril helps "definitely" and "muscle relaxers will make these muscles relax and not hurt so bad but they also put me to sleep." *Id.* at 74. She takes it at night but "[t]here are some days [about once or twice a week] that I have to take it a couple times a day." *Id.* She has three to four "bad days" with back pain. "There are days I don't get dressed," and thus stays in bed. *Id.* at 76.

Plaintiff also suffers from Chronic Obstructive Pulmonary Disease (COPD).[3] Doc. 19-2 at 76. A lifelong cigarette smoker who now uses an

---

[3] "COPD is a chronic inflammatory lung disease that causes obstructed airflow from

electronic cigarette "90 percent of the time," *id.* at 77, she suffers shortness of breath and thus can walk "[h]alf a block maybe to a block." *Id.* at 76. She also endures chest tightening during such walks. *Id.* at 78. Her COPD worsens during hot and humid weather. *Id.*

These ailments limit Lane's physical activities. She and her husband attend church but it is physically hard for her sit through a church service. Doc. 19-2 at 78. They rarely go out to eat, she does only "very light" housework, and performs no yard work on their 180-acre spread. *Id.* at 78-79. Lane does grocery shops only once or twice a month and when she does she must lean on a grocery cart. "It may take me 20 minutes to walk from one end of the store to the other." *Id.* at 82.

Her indoor activity also is restricted. Plaintiff is able to load her dishwasher but "it may take me two or three trips to the kitchen to get it done." *Id.* at 80. She prepares "one pot meals, crockpot meals, things that I don't have to stand and watch over." *Id.* at 83. She can stand for

---

the lungs. Symptoms include breathing difficulty, cough, mucus (sputum) production and wheezing. It's caused by long-term exposure to irritating gases or particulate matter, most often from cigarette smoke. People with COPD are at increased risk of developing heart disease, lung cancer and a variety of other conditions." http://www.mayoclinic.org/diseases-conditions/copd/home/ovc-20204882 (site last visited July 22, 2016).

about "[t]en, fifteen minutes at the most, and that's on a good day."  *Id.* Lane watches TV but "most of the time I fall asleep." Doc. 19-2 at 81. Her inability to concentrate inhibits reading, and she has difficulty remembering doctor's appointments and paying her bills.  *Id.* at 81-82.

Finally, plaintiff also suffers from depression.  Doc. 19-2 at 84. Her doctor first prescribed Wellbutrin, then (when that didn't work) Celexa.  *Id.*  Celexa helps "take the edge off" of her sense of despair over her medical condition and the pain and incapacitation that it wreaks.  *Id.* at 85.

The forgoing review of the entire evidentiary hearing transcript reveals *no* mention of hospitalization, nor any quest for post-hospitalization home or hospice care.  In fact, it reflects Lane's pursuit of a (DIB) claim, *not* (as is further demonstrated *infra*) a "Medicare Part A" claim.[4]

---

[4]   The ALJ even consulted a Vocational Expert (VE), who testified that her past (within the past 15 years) work closely approximated the "bookkeeper" and "administrative assistant" job titles listed in the Dictionary of Occupational Titles. Doc. 92-2 at 89.  The ALJ aired two hypotheticals, and his second asked the VE to assume an individual of Lane's same age and education, who could lift or carry no more than ten pounds occasionally, carry small items like folders or pens frequently, and would be unproductive for about a quarter to a third of a workday due to pain. *Id.* at 91-92.   The VE opined that such an individual would not be able to perform any

## II. DUE PROCESS

Lane's due process claim leads the Court back to her application: "I apply for a period of disability *and/or* all benefits for which I am eligible under Title II [*i.e.*, DIB] *and* Part A of Title XVIII of the Social Security Act, as presently amended."[5]  Doc. 19-5 at 2 (emphasis added).  She thus sought both DIB *and/or* Medicare Part A benefits.  But her opening brief before this Court ignores the Medicare Part A claim.  Doc. 23.  In fact, it says that she "filed a claim for Title II benefits alleging disability beginning September 30, 2009."  *Id.* at 2; *see also* doc. 28 at 1 (same).

In any event, Lane's October 19, 2010 application required her to show, for DIB, an "insured status" (*i.e.*, that she had worked and thus

---

of plaintiff's past work activities.  *Id.* at 92.  In fact, she could not be able to obtain and maintain active employment outside of a "sheltered workshop."  *Id.*

[5]  A claim under "Part A of Title XVIII" is a claim for Medicare.  *See, e.g., Kaohi v. Kaiser Foundation Health Plan, Inc.*, 2015 WL 6472231 at * 3 (D. Haw., Oct. 27, 2015) ("The Medicare Act ('Act') is found in Part A of Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* The Act provides insurance for the cost of hospital and related post-hospital expenses, but precludes reimbursement for services which are not 'reasonable and necessary' for the diagnosis or treatment of illness or injury."); *see also id.* (Section 405(g) of Title 42, which falls within a different section of the Social Security Act, provides for judicial review of old-age and disability claims only after the Secretary of Health and Human Services renders a 'final decision' on the claim."); *Wartenberg v. Aetna U.S. Healthcare, Inc.*, 2 F. Supp. 2d 273, 276 (E.D.N.Y. 1998).

contributed to the SSA system) [6] prior to her claimed disability's September 30, 2009 onset date. She insists that, at all administrative

---

[6] An encyclopedist explains "insured status":

> Social Security is an insurance program, and like virtually all other insurance programs, individuals must pay premiums in order to qualify for benefits. Workers pay their Social Security insurance premiums by means of FICA withholding from their salaries, wages, or funds they receive as self-employed individuals. After the worker has paid a certain amount of FICA premiums, over a certain amount of time, the worker is considered "insured" for Social Security purposes. The number of premiums that the worker must pay in order to be fully insured depends on the worker's age. Very young workers are fully insured after paying lesser amounts into the Social Security system.

> In addition, Social Security benefit coverage lapses after individuals stop paying their insurance premiums, *i.e.*, stop working and stop paying FICA withholding. A[n] individual who becomes disabled after her Social Security coverage has lapsed is not entitled to Social Security benefits, regardless of how much money she has paid into the Social Security system in the form of FICA withholding. However, a worker's insurance coverage does not lapse immediately after she stops working. The coverage continues for a certain period of time, and the individual is eligible for Social Security disability benefits as long as her disability begins within the window of time between the date she stops working and the date that her coverage lapses.

Kubitschek & Dubin, SOC. SEC. DIS. LAW & PROC. IN FED. CT. § 2:17 (2016 ed.) (footnotes omitted). "In order to meet the requirements for 'insured status,' which is required for Title II benefits, an individual must have 20 quarters of coverage in a 40-quarter period ending with the first quarter of disability. *See* 42 U.S.C. §§ 416(i)(3)(B), 423(c)(1)(B); 20 C.F.R. § 404.130 (2008)." *Tyser v. Astrue*, 2010 WL 2541255 at * 1 (D. Neb. June 17, 2010). And "[d]isability must be proven to exist during the time that the claimant is insured within the meaning of the special insured status requirements of the Act." *Chelette v. U.S. Comm'r, Soc. Sec. Admin.*, 2016 WL 3156399 at * 3 (W.D. La. May 9, 2016).

Here the record shows that the SSA calculated Lane's insured status (using acronyms that only a bureaucrat could love or understand): "Based on 20/40 (or special) DIB and fully insured tests: Does not have DIB insured status in or after

claim-consideration and adjudication levels, the SSA never questioned that insured status. Instead, it waited until after it rejected her claim and replied to her opening brief here to claim that its DIB-benefits denial is due to her lack of insured status.[7] She correctly reminds that the ALJ never explicitly mentioned that, and she points to this portion of the SSA's response brief:

> On October 17, 2010,[8] Plaintiff filed an application for Medicare under Part A of title XVIII of the Social Security Act, alleging she became disabled on September 30, 2009 (Tr. 167).

* * *

---

quarter of ADO (9/30/2009). . . ." Doc. 19-5 at 17. The Court cannot divine what "ADO" means. The form also reflects something called "Second DLI: 6/30/2009." *Id.* Presumably "DLI" means "Date Last Insured." Finally, it shows that Lane's earnings were as follows: 2009: $810; 2010: $120. *Id.* at 18. Lane points to another form in the same document-cluster: doc. 19-5 at 23, cited in her reply brief, doc. 28 at 2 n. 2. That form says this: "Second DLI: 12/31/2014." Doc. 19-5 at 23. And this: "Has DIB insured status in or *after* quarter of AOD (9/30/2009)." *Id.* (emphasis added). Lane says that "suggest[s] a date last insured of December 2014; throughout the administrative proceedings . . . and, indeed, until the [SSA] filed [its response brief here, she] and her counsel presumed she was insured for DIB purposes through December 31, 2014." Doc. 28 at 2 n. 2.

[7]  Actually, that's not true. The SSA filed its administrative record with this Court -- reflecting the administrative determination on this point, *see* n. 3 *supra* -- months before it filed its response brief. Doc. 19 (Transcript filed September 28, 2015); doc. 19-5 at 23-26 (part of that transcript reflecting the SSA's "insured status" determination); doc. 24 (the SSA's response brief, filed June 2, 2016).

[8] Her application says "October 19, 2010, 11:01," doc. 10-5 at 2 (top right-hand corner), but this discrepancy is immaterial given the issues raised here.

Plaintiff also applied for disability insurance benefits (DIB) under title II of the Social Security Act (Tr. 167). But, contrary to Plaintiff's assertions, Plaintiff's insured status expired prior to the alleged onset of her disability (Tr. 182). Accordingly, Plaintiff was not eligible for DIB.

Doc. 24 at 1, 2 & n. 1. Lane then expresses surprise at that:

It appears, based on the document referenced by the Commissioner (Tr. 182 [Doc. 19-5, p.17]) that it is the Commissioner's position that June 30, 2009 was Mrs. Lane's date last insured for Title II disability insurance benefits. This is a position *never previously communicated to Mrs. Lane by the Commissioner.*[9] The record reveals that the Commissioner never provided notice to Mrs. Lane that she was ineligible for disability insurance benefits after June 30, 2009 due to the expiration of her insured status. In fact, there was never even an initial determination explaining that Mrs. Lane was ineligible for disability insurance benefits on the basis of a lapse in coverage. To the contrary, throughout the administrative proceedings, and in the notice of hearing, and even during the hearing, the Commissioner led Mrs. Lane to believe that the issue to be considered by the administrative law judge was whether or not she was disabled on or before December 31, 2014 for purposes of disability insurance benefits, not whether she was disabled for these cash benefits on or before June 30 2009. Mrs. Lane's eligibility for disability insurance benefits was never explicitly addressed or decided by the administrative law judge. His decision appears to be directed only to Mrs. Lane's eligibility for Medicare before age 65.

Doc. 28 at 2-3 (emphasis and footnote added).

---

[9] *See* supra n. 7.

Lane thus argues that her due process right to reasonable notice was violated. That is, the SSA never gave her "notice that she was ineligible for disability insurance benefits based on her date last insured prior to the filing of the Commissioner's memorandum in this Court[.]" Doc. 28 at 3. The SSA, she further contends, should have early on provided her notice that she was ineligible for DIB benefits based on her date last insured. That way, she could have amended her alleged onset date to June 30, 2009 or earlier, or provided evidence and argument as to whether or not she had sufficient quarters of coverage to qualify for those DIB cash benefits after June 30, 2009. *Id.* at 3-4. Indeed, she further points out (in interrogatory form) that the ALJ's hearing notice spoke of disability insurance benefits only, and the ALJ never informed her "that her disability status on or before June 30, 2009 was the threshold issue in her claim for disability insurance benefits." *Id.* at 4. Nor did the ALJ's opinion address her DIB claim. *Id.*

Remand is demanded, she contends, because (a) the SSA never issued a final administrative decision on her disability (DIB) claim, but instead on a Medicare Part A claim (though she doesn't explicitly say

this); and (b) the SSA's defective hearing notices denied her procedural due process -- she should now be permitted to amend her alleged onset date and present insured-status evidence. Doc. 28 at 5. Finally, she wants the SSA's decision vacated to prevent the *res judicata* doctrine from being applied against her on remand. *Id.*

Lane's due process claim is best understood by first reviewing the basis of the ALJ's ruling, as affirmed by the Appeals Council. Recall that Lane herself applied for disability insurance benefits (DIB) *and* Medicare. Doc. 19-5 at 2; *Kaohi*, 2015 WL 6472231 at * 3 ("Part A of Title XVIII" is a claim for Medicare). Lane represented that she "became unable to work . . . on September 30, 2009." *Id.* The ALJ expressly denied her application for Medicare Part A benefits on the merits, and (tacitly) DIB benefits based on lack of insured status. Doc. 19-2 at 3 (noting that she met the insured status "regarding Medicare coverage through December 31, 2014" but omitting mention of DIB coverage).

Long-settled law placed Lane on notice, before she even applied for benefits, of her "insured status" requirements. *See generally*, Soc. Sec. Dis. Law & Proc. in Fed. Ct. § 2:17 ("Insured Status"); *supra* n. 6. So it

is questionable whether Lane can claim the lack of notice which, as is further explained below, is a Due Process touchstone. And one's work history is unchangeable, as is all history. A claimant either worked/contributed so many quarters or not. Still, plaintiff is correct that the SSA could have done a better job communicating with her.

Case law also (discussed *infra*) authorizes remand where the *Court itself* is confused by an SSA ruling. And while not dispositive, Lane's belief that she could meet the insured status requirements on remand enhances that disposition's attractiveness. Doc. 28 at 3 (representing that, had the SSA given her notice, "she could have . . . provided evidence . . . as to whether or not she had sufficient quarters of coverage to qualify for cash benefits after June 30, 2009"); *see also id.* (representing that she can show that she was disabled *within* the "insured status" time now set by the SSA).[10]

---

[10]   More specifically, she represents that if she

had received notice that her date last insured for entitlement to disability cash benefits had expired before the onset date of disability on her application, she would have offered additional evidence, such as statements from her employer regarding her declining job performance during the 2008-2009 school year and at the start of the next school year, statements from her long-time treating physician Dr. Purvis specifically directed to the period prior to her date last

Still, notice is a two-way street. And Lane is rather quiet about what she indisputably sought from the get-go: DIB *and* Medicare Part A benefits. Doc. 19-5 at 2.[11] Indeed, she does not now affirmatively disclaim any intent to pursue Medicare Part A benefits, even though it's pretty apparent that she unwittingly selected "Medicare Part A" in her initial application and everyone forgot about that until the ALJ, after laboring through a comprehensive DIB-opinion, evidently discovered Lane's lack of insured status coverage, then *sua sponte* decided that her

---

insured of June 30, 2009, and payroll and time and attendance records showing her absences and earnings during each month in 2008 and 2009.

Doc. 28 at 13.

[11]   Note that

Social Security claimants often qualify and apply for other types of disability benefits, including Workers Compensation Benefits, Veteran's Disability Benefits, employee or union pensions (sometimes known as "long term disability" benefits), state disability benefits, or public assistance (welfare) benefits. Conversely, they may have applied for assistance to other agencies which make determinations of disability as one condition of eligibility for benefits. For example, public or private vocational rehabilitation agencies routinely evaluate disability, because they reject as candidates for rehabilitation all individuals who are too sick or injured to work. Welfare departments also routinely undertake disability evaluations of applicants for and recipients of public assistance, in conjunction with federal and state statutes which require welfare recipients to work, with exceptions for recipients who are disabled.

Soc. Sec. Dis. Law & Proc. in Fed. Ct. § 2:47 (footnote omitted).

insured status supported only Medicare Part A coverage, so he "changed the label" at the last minute.[12]

At the same time, the SSA's notices to the plaintiff have at best been confusing. At the end of her administrative appeal of the ALJ's denial of that claim, for example, there is this: "Order of Appeals Council . . . CLAIM FOR . . . Disability Insurance Benefits." Doc. 19-2 at 7. And at the front end of that process is the ALJ's hearing notice, which beckoned her to submit any and all evidence that she wished in support of her "application of October 28, 2010[13] for a Period of Disability Insurance Benefits under sections 216(i) and 223(a) of the Social Security Act (the Act). The ALJ will consider whether you are disabled under sections 216(i) and 223(d) of the Act [hence, DIB]." Doc. 19-4 at 21 (footnote added); *see also id.* at 26 (encouraging her to timely submit any other supporting evidence that she wished).

---

[12] The SSA's brief here cites *no* Medicare Part A cases but instead merely references 42 U.S.C. § 423 and § 426(b) in passing (doc. 24 at 4) -- without bothering to acknowledge (as will be shown) that Lane never tendered any evidence in support of those very particularized benefits.

[13] It is unclear why different dates surface on this point, but in the scheme of things the difference is immaterial.

That *DIB*-based notice conspicuously contrasts with the ALJ's ultimate decision, which on page one identifies her claim for "Hospital Insurance Benefits (Entitlement Federal Employee)."[14] Doc. 19-2 at 38. The same must be said for his ultimate denial: "Based on the application for entitlement to Hospital Insurance Benefits (Medicare) as a disabled individual filed on October 18, 2010, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act." Doc. 19-2 at 49; *see also* doc. 19-2 at 34 (internal, November 30, 2012 SSA memo from "Mary Renfroe," identified as "Writer," to the ALJ: "Medicare case (Notice of Hearing dated July 12, 2012 is incorrect, as it indicates the issue that will be considered is whether the claimant qualifies for a Period of Disability and Disability Insurance Benefits)."); *see also* doc. 19-2 (the hearing in this case was held *before* that date, on November 6, 2012, so Renfroe's warning came too late).[15]

---

[14]   Even that's confusing -- nothing indicates that Lane is a federal employee.

[15]   Per SSA regulations, "the notice of hearing 'will contain a statement of the specific issues to be decided' and must be mailed or served at least 20 days before the hearing. 20 C.F.R. § 404.938. The purpose of the notice of hearing is to allow the plaintiff to adequately prepare to litigate the issues at the hearing." *Dunnells v. Comm'r of Soc. Sec.*, 2013 WL 1909590 at * 2 (M.D. Fla. Apr. 22, 2013) (quotes and cite omitted). "If the notice of hearing fails to inform the plaintiff of material factors

Meanwhile, and although the ALJ's decision is silent on the topic, Lane does *not* seriously dispute (as the record now stands) her lack of sufficient earnings to maintain her DIB insured status after June 30, 2009. Her reply brief suggests that she could prove that, doc. 28 at 3, but she cites no supporting evidence in her possession. And while procedural due process doctrine is aimed at preventing arbitrary government entitlement decisions,[16] it is tailored to practical concerns. *See, e.g., Yamasaki*, 424 U.S. at 706 (under certain circumstances an agency's written review of records is sufficient for due process purposes); *George W. v. U.S. Dep't of Education*, 149 F. Supp. 2d 1195, 1204 (E.D. Cal. 2000) ("Due process requires notice and an opportunity to be heard, but it does not automatically require a formal hearing.").

Defective-notice-based due process claims also require a showing of prejudice. *See generally* SOC. SEC. DIS. LAW & PROC. IN FED. CT. § 2:47 (an example of prejudice: when a claimant appeals one issue to the SSA's

---

which could lead to an adverse decision, then the notice is not adequate and the plaintiff's procedural due process rights are violated." *Rice*, 1999 WL 33597094 at * 4.

[16] *See Califano v. Yamasaki*, 442 U.S. 682, 696 (1979); *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *Dunnells*, 2013 WL 1909590 at * 2; *Rice v. Apfel*, 1999 WL 33597094 at * 3 (M.D. Fla. Oct. 14, 1999).

Appeals Council and the Council denies not only that issue but also -- and without prior notice and thus, an opportunity to be heard -- adversely re-determines an unappealed, favorable issue); doc. 28 at 9-10 (Lane's reply brief collecting illustrative cases). It is doubtful that Lane has shown that here. She had every incentive, and opportunity, to show the maximum duration of her claimed disability, and the record shows that she did. Conversely, she claims she can, but fails to affirmatively cite evidence in her possession, to show how she would fill in the "insured status" gap (*e.g.*, adduce past-employment records showing that she can satisfy the "quarters" requirement set forth in note 6 *supra*).

Nevertheless, the ALJ's decision, while premised on the issue of Lane's entitlement "to hospital insurance coverage (Medicare) as a disabled individual in accordance with Section 226(b) of the Social Security Act," doc. 19-2 at 38, reads like a DIB claim. And, as comprehensively set forth above, the entire evidentiary hearing unfolded as a DIB claim (no mention of hospitalization, much less the need for post-hospitalization grade home care, and the ALJ's hearing even concluded with VE testimony concerning Lane's ability to rejoin the

workforce).   That presents a more fundamental problem because the
Court is unable to discern whether the ALJ and Appeals Council (hence,
the Commissioner) applied the proper legal standard to Lane's "hospital
coverage" Medicare Part A claim.   In that regard:

> The Medicare statute, enacted in 1965, is a federal health insurance
> program primarily *benefitting those 65 years of age or older. See*
> Social Security Amendments of 1965, Pub.L. No. 89–97, 79 Stat. 286
> (codified as amended at 42 U.S.C. §§ 1395 to 1395kkk–1). To be
> eligible, an individual must be (1) 65 years of age or older; (2)
> disabled and entitled to social security disability benefits; or (3)
> medically determined to have end stage renal (kidney) disease. 42
> U.S.C. § 1395c. The Centers for Medicare and Medicaid Services
> ("CMS") is the agency within the Department of Health and Human
> Services charged with the administration of Medicare. *See Sw.*
> *Pharm. Solutions, Inc. v. Ctrs. for Medicare and Medicaid Servs.*,
> 718 F.3d 436, 439 (5th Cir. 2013). The Medicare program is divided
> into four major components—Parts A, B, C, and D. *Part A of the*
> *program provides for hospital insurance services, including*
> *inpatient hospital services, post-hospital extended care services, home*
> *health services, and hospice care.* 42 U.S.C. § 1395d(a). Part B is a
> voluntary program that provides supplemental benefits to Medicare
> participants to cover the costs of, among other things, home health
> services, physician services, and outpatient physical therapy
> services. 42 U.S.C. § 1395k. Part C, the "Medicare + Choice" (M+C)
> program, allows eligible participants to opt out of the traditional
> Part A fee-for-service system and instead obtain various benefits
> through Medical Advantage Organizations, which receive a fixed
> payment from the United States for each enrollee. 42 U.S.C. §§
> 1395w–21, w–29. Part D of the program provides a prescription drug
> benefit program. 42 U.S.C. §§ 1395w–101 *et seq.*

*Born v. Sebelius*, 968 F. Supp. 2d 1109, 1113 (D. Colo. 2013) (emphasis added).

Lane was 61 at the time of the hearing in this case. Doc. 19-2 at 57. She thus failed to meet the age requirement for Medicare Part A. The SSA did cite (doc. 24 at 4) a statutory provision for extending Medicare Part A coverage to those under 65, but the ALJ made no finding that Lane meets the gateway criteria for it, per 42 U.S.C. § 426(b):

(b) Individuals under 65 years

Every individual who--

(1) has not attained age 65, and

(2)(A) is entitled to, and has for 24 calendar months been entitled to, (i) disability insurance benefits under section 423 of this title. . . .

\*    \*    \*    \*

shall be entitled to *hospital insurance benefits* under part A of subchapter XVIII of this chapter. . . .

42 U.S.C. § 426(b) (emphasis added). The ALJ's ruling in this case makes no mention of hospital insurance benefits (*i.e.*, for post-hospital, extended care services, home health services, or home-hospice care),

and the case law illustrates that such claims travel through an entirely

different benefits channel than DIB:

> Medicare has two parts, Parts A and B. Medicare Part A is automatic and premium-free; it provides reimbursement for inpatient hospital services, post-hospital extended care services, home health services, and hospice care. *See McCreary v. Offner* 172 F.3d 76, 78 (D.C. Cir. 1999) (citing 42 U.S.C. §§ 1395c-i). Medicare Part B is a voluntary supplemental program that covers medical and other health care services. 42 U.S.C. §§ 1395j-x. . . .

> The Medicare program is administered through private contractors by the Centers for Medicare and Medicaid Services ("CMS"), which is part of the United States Department of Health and Human Services ("HHS"). 42 U.S.C. §§ 1395h, 1395u. The contractors (usually insurance companies) are responsible for making an initial determination on claims under Parts A or B on the basis of regulations and other policies articulated by the Secretary. 42 U.S.C. § 1395ff(a)(1). Contractors responsible for making coverage determinations regarding skilled nursing services are referred to as "fiscal intermediaries." When a claim is filed, a fiscal intermediary . . . makes an initial determination regarding whether to pay the claim on the basis of the information provided by the skilled nursing facility. . . . 42 U.S.C. § 1395ff(a)(1); 42 C.F.R. § 405.904(a)(2). If the claimant is dissatisfied with the intermediary's initial determination, he or she is entitled to request a redetermination by the intermediary, *see* 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. § 405.940, and then a redetermination by a qualified independent contractor ("QIC") . . . *see* 42 U.S.C. § 1395ff(c)(3)(B)(i); 42 C.F.R. § 405.968.

*Russell v. Sebelius*, 686 F. Supp. 2d 386, 392 (D. Vt. 2010). Only after

that effort fails can the claimant seek further review with the SSA:

If the claimant is dissatisfied with the decision of the QIC, and the amount in controversy exceeds a certain threshold amount, the claimant may request a hearing before an ALJ. 42 U.S.C. § 1395ff(d)(1); 42 C.F.R. §§ 405.1000, 405.1002. At that hearing, the claimant has an opportunity to submit new evidence, and, if the intermediary elects to participate in the hearing, the claimant may conduct discovery. 42 C.F.R. §§ 405.1018, 405.1036, 405.1037. If the claimant is dissatisfied with the ALJ's decision, he or she may appeal to the Medicare Appeals Council ("MAC"). 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. §§ 405.902, 405.1100. Finally, the MAC issues a decision, which is subject to review in federal court, see 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1130, 405.1136, if the amount in controversy is at least $1,000, adjusted for inflation, see 42 U.S.C. § 1395ff(b)(1)(E)(i); 42 C.F.R. § 405.1006(c).

*Id.* at 393; *see also Martinelli v. Burwell,* 130 F. Supp. 3d 781, 790 (W.D.N.Y. 2015) (substantial evidence supported MAC's determination that claimant's care plan for post-hospital combination of impairments did not qualify as skilled nursing services eligible for Part A Medicare coverage), cited in 5 WEST'S FED. ADMIN. PRAC. § 6310 n. 6 (July 2016) (explaining that "Part A of the Medicare Act provides for payment of insurance benefits for acute care given in a hospital and extended care services given in a skilled nursing facility. Medicare does not cover care that is considered to be merely custodial. Thus, personal care services that do not require the skills of qualified technical or professional personnel are not covered by Medicare. Such services include

administration of oral medication, bathing and treatment of minor skin problems, assistance in dressing, eating and going to the toilet, and general supervision of previously taught exercises and assistance with walking").

The above evidentiary hearing summarization demonstrates that Lane *never* invoked that channel and that this case simply went off the rails. Rather than rule that her claim should be denied for lack of insured status, the ALJ simply labeled it a Medicare Part A claim, and for a "Federal Employee" at that, doc. 19-2 at 38, then treated it as a DIB claim, not a "hospital insurance benefits" claim, though he (evidently in afterthought, after re-reviewing the record and discovering Lane's lack of insured status), chose to simply re-label it as a Medicare Part A case. *Id.* at 38-48.

## III.  CONCLUSION

This much is clear: Lane is not and has not been pursuing "reimbursement for inpatient hospital services, post-hospital extended care services, home health services, and hospice care." *Russell*, 686 F. Supp. 2d at 392. Instead, she seeks straight-up "cash benefits," as

repeatedly noted in her reply brief. Doc. 28 at 2, 3, 4, 6 & 13. The SSA in substance treated her case as a DIB claim but then re-labeled its ruling as a Medicare Part A claim -- ignoring the demonstrably different legal channel (set forth *supra*) through which such claims must travel.

Courts should not affirm SSA rulings that are unclear or require speculation. "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Davenport v. Colvin*, 2015 WL 7769684 at * 3 (E.D. Cal. Dec. 3, 2015) (quotes and cite omitted). A remand under 42 U.S.C. § 405(g)[17] (with the

---

[17]  In pertinent part that statute provides:

The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may *at any time* order additional evidence to be taken before the Commissioner of Social Security, *but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding*; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g) (emphasis added). Lane represents that she has new evidence and, given the SSA's confusing notices and treatment of her otherwise convoluted (if not

Clerk directed to enter a separate judgment pursuant to the Fed. R. Civ. P. 58) is warranted here because the SSA is simply unclear on the basis of its ruling.  *See Reed v. Colvin*, 2016 WL 3753217 at * 1 (D.S.C. July 14, 2016).   On remand, the Commissioner must clarify the basis for the SSA's denial of what obviously was a DIB claim (though Lane, perhaps inadvertently, also coupled it with a Medicare Part A claim, which she should expressly renew or withdraw upon remand).

**SO REPORTED AND RECOMMENDED**, this 22nd day of July, 2016.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

unwitting) DIB/Medicare claim, good cause exists to remand and incorporate her evidence within a *clearly defined* claim (*i.e.*, Lane is directed to affirmatively communicate whether she pursues only a DIB claim here).